# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **WILLIAM E. ALSUP,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 3:12-00415** |
| **v.** | ) | **Judge Nixon/Brown** |
| | ) | |
| **CAROLYN W. COLVIN, ACTING** | ) | |
| **COMMISSIONER OF SOCIAL SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**To: The Honorable John T. Nixon, Senior United States District Judge**

## REPORT AND RECOMMENDATION

This action was brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c) to obtain judicial review of the final decision of the Social Security Administration (SSA), through its Commissioner ("the Commissioner"), denying plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 416(i), 423(d). For the reasons explained below, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the record (DE 17) be **DENIED**, and the Commissioner's decision **AFFIRMED**.

## I. PROCEDURAL HISTORY

Plaintiff protectively filed an application for DIB on August 28, 2008 alleging a disability onset date of January 15, 2008. (DE 16-1, pp. 15, 132) Plaintiff's claim was denied on December 17, 2008, and again upon reconsideration on April 15, 2009. (DE 16-1, pp. 59-62, 70-71)

Plaintiff, through counsel, filed a request on April 22, 2009 for a hearing before an Administrative Law Judge (ALJ). (DE 16-1, pp. 72-73) The hearing was held on July 20, 2010 before ALJ Ronald Miller. (DE 16-1, pp. 29-53, 81-92) Thereafter, the ALJ entered a partially favorable decision on August 10, 2010 (DE 16-1, pp. 11-28), holding that plaintiff "was 'disabled'

from January 15, 2008 through January 17, 2010," but that his "disability ended on January 18, 2010" (DE 16-1, p. 15).

Plaintiff filed a request with the Review Council on September 20, 2010 seeking review of the ALJ's decision that his disability ended on January 18, 2010.  (DE 16-1, p. 7)  The Appeals Council denied the request on March 30, 2012 (DE  11, pp. 1-5), whereupon the ALJ's decision became the Commissioner's final decision.

Plaintiff brought this action on April 26, 2012 seeking judicial review of the Commissioner's decision.  (DE 1)  Thereafter, plaintiff filed a motion for judgment on the administrative record on August 29, 2012 (DE 17),[1] to which the Commissioner filed a response in opposition on November 13, 2012 (DE 21).  This matter is now properly before the court.

## II.  REVIEW OF THE RECORD

### A.  Medical Evidence

Plaintiff was involved in a head-on motor vehicle accident on January 15, 2008.  (DE 16-1, pp. 216-19)  Plaintiff was admitted in critical condition to the Vanderbilt University Medical Center ("Vanderbilt") for a "comminuted right acetabular fracture,"[2] "left superior and inferior pubic rami fractures,"[3] "right humeral neck fracture,"[4] thirteen broken ribs, a transverse process fracture of the

---

[1]  The copy of the administrative record filed originally (DE 11) was missing pages 187-218.  The Commissioner filed a revised copy of the administrative record on August 3, 2012.  (DE 16)  The revised administrative record (DE 16-1) is cited herein.

[2]  "Comminuted" means "broken or crushed into small pieces . . . ," and "Acetabular," or "acetabulum," refers to "the large cup-shaped cavity . . . in which the head of the femur ["the bone that extends from the pelvis to the knee"] articulates . . . ." *Dorland's Illustrated Medical Dictionary* 391, 688 (32nd ed. 2012).

[3]  "Pubic rami" are the flat bones in the pubic region that form part of the acetabulum  *Id.* at pp. 1583, 1591.

[4]  The "humerus" is the  "bone that extends from the shoulder to the elbow." *Id*. at p. 873.  "Humeral neck fracture" is a fracture at the upper part of the humerus.

2

T-1 vertebrae,[5] a complex laceration of the right knee with intraarticular communication,[6] a laceration of the left knee, and numerous other less severe injuries. (DE 16-1, p. 218) After treating and closing the knee lacerations, plaintiff was admitted to the Vanderbilt trauma unit for treatment of his other injuries. (DE 16-1, p. 217)

Plaintiff's fractured humerus and acetabula were repaired surgically on January 19 and 20, 2008 respectively. (DE 16-1, pp. 208-10) Doctor Kurtis Staples, M.D. performed the surgery on plaintiff's shoulder; Dr. Philip Kregor, M.D. performed the surgery on plaintiff's shattered hip and related fractures. Plaintiff was discharged to home on January 26, 2008. (DE 16-1, pp. 202-03)

Plaintiff returned to Vanderbilt on February 4, 2008, at which time he was readmitted for surgery the next day to repair post-operative "gapping" that had occurred at the fracture site of his earlier hip surgery, and to repair under anesthesia post-operative problems that had developed with his right arm. (DE 16-1, pp. 194-201) Doctor Kevin Kahn, M.D. performed the hip-related surgery, and the procedure on plaintiff's right shoulder. Plaintiff was discharged to home on February 8, 2008. (DE 16-1, pp. 192-93)

Plaintiff returned to Vanderbilt on February 18, 2008 at which time x-rays showed that the right arm was "well healed," that there was proper "alignment and stability," and "no evidence of implant loosening or failure." (DE 16-1, pp. 191-92) X-rays of plaintiff's hip and pelvis showed "appropriate stabilization of the fracture with no evidence of implant loosening or failure." (DE 16-1, pp. 191-92)

Plaintiff returned to Vanderbilt again on March 24, 2008 at which time Dr. Kregor noted that plaintiff's right shoulder continued to heal/improve. (DE 16-1, p. 190) Doctor Kregor also noted

---

[5] "Transverse" fractures are "fracture[s] at right angles to the axis of the bone." *Id*. at 743.

[6] "Interarticular communication" means penetrating into the joint. *Id*. at 392, 947.

3

continued improvement with plaintiff's hip and pelvis. (DE 16-1, p. 191)

Doctor Kregor cleared plaintiff to engage in "aggressive range of motion" of his right shoulder on March 26, 2008. (DE 16-1, p. 190) Doctor Kregor described plaintiff's hip as follows: "[his] x-ray demonstrate[s] . . . joint space narrowing on the right acetabulum and otherwise normal bony architecture around the right hip area," concluding that "progressive weightbearing" would begin in four weeks. (DE 16-1, p. 190)

Plaintiff returned to Vanderbilt on April 28, 2008 with complaints of "shoulder pain radiating down towards his elbow," as well as "groin pains" and "some numbness around the incision on his buttock . . . ." (DE 16-1, p. 189) Doctor Kahn noted that x-rays taken during this visit "demonstrate[d] appropriate reduction and stabilization of [the] acetabular fracture . . . no evidence of implant loosening or failure . . . [and] some . . . consolidation of the fracture." (DE 16-1, p. 189) Doctor Kahn also noted that the x-rays revealed "some decreased joint space" in plaintiff's hip. (DE 16-1, p. 189)

Plaintiff returned to Vanderbilt on September 3, 2008 (DE 16-1, pp. 187-188) at which time Dr. Brian Fissel M.D. noted that the fractured humerus "ha[d] healed and ha[d] . . . excellent range of motion of his right upper extremity," an observation verified by an x-ray taken that same day. (DE 16-1, pp. 187-88) With respect to plaintiff's hip injury, the x-ray showed "significant posttraumatic arthritis and joint space narrowing with complete loss of cartilage of his right hip." (DE 16-1, p. 188) Based on the hip-related findings, Dr. Fissel advised plaintiff that his only option was "total hip arthoplasty."[7] (DE 16-1, p. 188)

Plaintiff was examined by psychological consultant Jeffrey Viers, M.A. on December 10, 2008. (DE 16-1, pp. 220-24) The purpose of the examination was "to determine the claimant's

---

[7] "Arthoplasty" is "the formation of movable joints," *i.e.*, joint replacement. *Id.* at 158

4

mental status and to document reported activities of daily living."  (DE 16-1, p. 220) In the context

of the mental examination, Mr. Viers noted that plaintiff: 1) was "alert, oriented, and cooperative";

2) was able to "follow simple commands"; 3) "appeared to have moderate concentration difficulty";

4) had "no signs of mania . . . paranoia, delusions, or hallucinations"; 5) "had good insight with

intact judgment"; 6) "most of the time he g[ot] along with others"; 7) "socialize[d] with friends and

family"; 8) "sometimes forg[ot] to take his medication"; 9) was "fair at following spoken and written

instructions"; 10) "ha[d] difficulty handling stress since the accident"; 11) possessed "academic

skills . . . in the low average range"; 12) "appeared to have mild difficulty with long term memory

and mild to moderate difficulty with social interaction"; 13) "likely would have moderate to marked

difficulty tolerating stress"; 14) "little to no difficulty taking normal precautions in a work place";

15) exhibited "compromised" short-term memory.  (DE 16-1, pp. 221-22, 224)

Doctor Mason Currey, Ph.D., a state agency consultant, conducted a review of plaintiff's

psychiatric and mental records on December 17, 2008.  (DE 16-1, pp. 234-51) Doctor Currey

assessed plaintiff's record for organic mental disorders, affective disorders, and anxiety-related

disorders.  (DE 16-1, pp. 234-247)  Giving the results of Mr. Vires's examination "great weight,"

Dr. Currey noted in assessing the disorders enumerated above that, although medically determinable

impairments were present, they did not "precisely satisfy the [required] diagnostic criteria." (DE 16-

1, pp. 235, 237, 239, 245-46)  Doctor Currey determined that plaintiff had "mild" limitations in daily

living activities, social functioning, "moderate" limitations in concentration, persistence, or pace,

and no episodes of decompensation.[8]  (DE 16-1, p. 244) Doctor Currey went on to note that plaintiff

exhibited cognitive defects due to the accident, adjustment disorder with mixed anxiety and

---

[8]  Doctor Currey's observations are supported by an accompanying mental residual functional capacity assessment completed that same date.  (DE 16-1, pp. 248-51)

depressed mood, and anxiety disorder with symptoms of post-traumatic stress disorder, but that none of these established the presence of the required criteria. (DE 16-1, pp. 235, 237, 239) Finally, Dr. Currey concluded that, although, plaintiff's allegations were credible, he demonstrated "no more than mod[erate] impairments in functional abilities due to [mental health] prob[lem]s overall." (DE 16-1, p. 246)(capitalization in original omitted)

Plaintiff returned to Vanderbilt on January 7, 2009. (DE 16-1, p. 281) X-rays taken that day showed the following: "Failed fixation with loosened and fractured posterior hardware on the right. Superoposterior shift of the femoral head. Additional lysis[9] of bone is suggested and may indicate infection." (DE 16-1, p. 281) Plaintiff was seen later that day by Dr. William Hakeos, M.D., at which time it was determined to schedule total hip replacement surgery "some time in February," Dr. Hakeos noting as well that he spoke with plaintiff about the need to seek "professional mental help," but that plaintiff had not sought such help. (DE 16-1, pp. 281-82)

Plaintiff underwent surgery for a total hip replacement on February 13, 2009. (DE 16-2, pp. 272-73) Doctor Kregor performed the surgery. Plaintiff was discharged from Vanderbilt to home on February 18, 2009. (DE 16-1, p. 259)

On February 18, 2009, Dr. George W. Livingston, Ph.D. affirmed Dr. Currey's December 17, 2008 psychiatric and mental health assessments of plaintiff as written. (DE 16-1, p. 256)

Physical therapist Brian Richardson saw plaintiff on February 20, 2009. (DE 16-1, p. 257-59) Mr. Richardson noted the following in his report: 1) "[p]atient reports the presence of pain, but states that it will not interfere with participation in treatment"; 2) "[p]atient rates highest pain at 5/10

---

[9] Lysis" is the "dissolution or destruction of an organ or structure, such as . . . bone . . . ." *Id.* at p. 1089.

6

. . . [and] lowest pain at 1/10 . . . .";[10] 3) "location of pain . . . right hip . . . stiffness . . swelling . . .

dull/aching . . . interrupts sleep . . . sharp/stabbing . . . ."  (De 16-1, p. 257)

Doctor Glenda Knox-Carter, M.D. performed a residual functional assessment (RFC) of

plaintiff on April 7, 2009.  (DE 16-1, pp. 283-88)  Doctor Knox-Carter determined that plaintiff had

the following exertional limitations: 1) able to lift 50 pounds occasionally; 2) able to lift 25 pounds

frequently; 3) able to stand and/or walk with normal breaks  a total of 6 hours in an 8-hour workday;

4) able to sit about 6 hours with normal breaks a total of about 6 hours in an 8-hour workday; 5)

unlimited ability push and/or pull including operation of "hand and/or foot controls"; 6) able to

climb, balance, stoop, kneel, crouch, and crawl frequently.  (DE 16-1, pp. 284-85)  (The foregoing

served as the basis of the ALJ's hypothetical to the VE at the hearing on July 20, 2010.  (DE 16-1,

p. 48))  Doctor Knox-Carter "project[ed] this RFC from the date of surgery to the given rating."[11]

(DE 16-1, p. 288)

Plaintiff returned to Vanderbilt on July 15, 2009.  (DE 16-1, pp. 291-93)  Although the x-rays

showed "appropriate alignment of his total hip," Dr. Kregor noted that plaintiff had "some

complaints of pain around the lateral aspect of his hip . . . some pain in his right shoulder . . . [and]

some so-called numbness in the area of the sciatic nerve . . . ."  (DE 16-1, p. 291)  Doctor Kregor

also wrote the following with respect to plaintiff's hip: 1) there has been "no significant change in

prosthetic alignment since 05/13/09"; 2) "[t]here is no evidence of hardware failure or migration";

3) there is "[n]o evidence of new fracture or dislocation."  (DE 16-1, p. 292)  As to plaintiff's arm,

_____

[10]  The Universal Pain Assessment Tool uses a 0-10 scale for patient assessment.  A score of 5 corresponds to
"moderate pain" at the lower end of which interferes with tasks, and at the upper end interferes with concentration.  A
score of 1 is somewhat above no pain, but less than mild pain that can be ignored.

[11]  Doctor Knox-Carter also noted in the same report that "[t]his RFC is projected as the impairment is expected
to improve and pain to resolve with continued appropriate medical therapy."  (DE 16-1, p. 287)  These two statements
are in apparent conflict.

Dr. Kregor wrote, "[t]he fracture is healing with appropriate alignment." (DE 16-1, p. 293)

On December 2, 2009, plaintiff went to the Primary Hope Clinic ("Hope Clinic") in Murfreesboro for reasons related primarily to diabetes and an unspecified sleep disorder. (DE 16-1, pp. 297-98) Characterized as a "[n]ew patient to the clinic," the record shows that plaintiff had no fatigue, no joint pain, no joint stiffness, no swelling, no tingling/numbness, that he appeared alert and oriented, but claimed to have memory loss from the accident.[12] (DE 16-1, p. 297)

Plaintiff returned to Vanderbilt on January 18, 2010. (DE 290) Doctor Kregor ordered x-rays that were interpreted by Dr. F/N/U Taber, who noted that the x-ray of plaintiff's right hip showed" 1) "no evidence of prosthetic loosening, migration, or periprosthetic fracture"; 2) "[t]he prosthetic femoral head and left femoral head are located"; 3) "[t]here are no new abnormalities"; 4) "no radiographic evidence of complication." (DE 16-1, p. 290) Dr. Kregor did not write a clinical note pertaining to these x-rays.

## B. Transcript of the Hearing

### 1. General

The hearing was held on July 20, 2010. (DE 16-1, pp. 29-53) Plaintiff provided no medical source statements. (DE 16-1, p. 31) Plaintiff's application for DIB stemmed from the January 15, 2008 automobile accident. (DE 16-1, p. 32)

### 2. Plaintiff's Testimony

Plaintiff testified that he was forty-five (45) years old at the time of the hearing, that he completed twelfth grade at a vocational high school, that he had worked for his father for eight (8) years after school until he found other employment, and that he had worked steadily until the time

---

[12] Counsel for plaintiff supplemented the record on June 23, 2010, providing records from the Hope Clinic for the period September 9., 2009 through April 21, 2010. Apart from these observations on December 2, 2009, the records filed by counsel pertain solely to blood panels, apparently associated with diabetes and cholesterol issues.

8

of the accident. (DE 16-1, p. 33) Plaintiff testified that he had not worked since the accident. (DE 16-1, p. 34) Plaintiff testified further that he was having difficulties walking and with his balance at the time of the hearing, and that he had been told at a follow-up appointment at Vanderbilt the previous day that those problems were "mainly permanent." (DE 16-1, pp. 34-35)

On questioning by counsel, plaintiff testified that the medical staff at Vanderbilt had taken an x-ray of his hip the day before the hearing, that they also had taken blood samples to see if he had "any further infections,"[13] but that he did not know the results. (DE 16-1, pp. 35-36) Plaintiff also claimed that he experienced, "[p]ain, numbness, tingling, [and] dizziness" when he walked, and that he experienced those symptoms within "the first two or three steps, five, 10, 15 minutes." (DE 16-1, p. 36) According to plaintiff, he would "usually sit back down or lie down" when he experienced those symptoms. (DE 16-1, p. 36)

Plaintiff testified that a doctor suggested he use a cane, that he had used one for "almost two years since [he] got out of the hospital the first time," and that the cane gave him "a little bit of stability." (DE 16-1, pp. 36-37) Regarding his balance, plaintiff testified that his weight felt like it "shift[ed] to the right" when he walked, and that he would "get dizzy from [his] coordination." (DE 16-1, p. 37) As to his coordination, he testified that he had trouble moving his right leg, which caused him to stumble and trip. (DE 16-1, p. 37)

On further examination by counsel, plaintiff testified that he could stand in one spot for five to ten minutes before experiencing pain, numbness and tingling in his hip, leg and foot, and that the only thing that alleviated the symptoms was to "sit or lie down." (DE 16-1, p. 38) Plaintiff went on to testify that he experienced leg cramps and pain when he sat, but the circumstances under which

---

[13]  The last apparent reference in the medical records to the "concern" for infection was recorded in February 2009.

he experienced those symptoms varied. (DE 16-1, pp. 39-40) He also testified that he suffered from pain, tightness, tingling as well as numbness in his foot when he got up and down from a sitting position. (DE 16-1, p. 40)

Plaintiff testified that he also had problems with his right shoulder, and that recovery from surgery on his shoulder had been "painful and difficult." (DE 16-1, p. 40) Plaintiff testified further that, although he had no problem lifting things with his left arm, he had trouble picking things up with his right arm, and that he could lift "[n]ot much more" than 5 to 10 pounds with his right arm. (DE 16-1, p. 41) He also stated that he experienced "tightness and pain" when reaching over his head with his right arm. (DE 16-1, p. 41)

Plaintiff testified that he hit his head in the accident, that he had some problems due to that injury, but apart from seeing a Social Security consultant, he had not received any treatment for problems related to that injury. (DE 16-1, p. 41) Plaintiff testified that problems associated with his alleged head injury included making decisions, remembering important things such as the need to take his medication, and that those problems had not abated since the accident. (DE 16-1, p. 42) He also testified that he had difficulty doing calculations, and that it was difficult for him to concentrate and make calculation-related decisions. (DE 16-1, p. 42)

As to household chores, plaintiff testified that he had problems going up and down steps with laundry, that he had difficulty standing in the kitchen to cook, and that "[s]ometimes [he] g[o]t dizzy and [would] feel like [he was] going to fall." (DE 16-1, pp. 42-43) Asked if he shopped for his own food, plaintiff testified that he did, but that he had become "very nervous" about driving since the accident. (DE 16-1, p. 43) Plaintiff nevertheless testified that he drove "once or twice a day," including picking up his daughter "every day." (DE 16-1, p. 43) Plaintiff testified that, with the help

of his father and sister, he took care of his daughter during the day while her mother was at work, including changing her diapers and preparing her meals.  (DE 16-1, pp. 44-45)

Plaintiff testified that the doctors told him he would not "be able to do the work that [he] was normally accustomed to."  (DE 16-1, p. 44)  When counsel asked plaintiff whether he thought he "could do something," plaintiff replied "No," explaining that he had "difficulty with [his] motivation . . . thinking and planning . . . ," but had not sought help for those problems.  (DE 16-11, p. 44)

### 3.  The VE's Testimony

The VE found three jobs that were vocationally relevant to plaintiff's past jobs: 1) delivery driver – medium exertion, semiskilled work due to the weight of goods that plaintiff delivered; 2) tow motor operator – medium exertion, semiskilled work; and 3) heavy equipment operator – medium exertion, skilled work.  (DE 16-1, p. 47)

The ALJ presented the following hypothetical to the VE: an individual of the same age, education, and work experience; able to lift and carry 50 pounds occasionally, 25 pounds frequently; stand and walk for about 6 hours out of the day and sit for about six hours out of a day; capable of frequent stooping crouching, kneeling, crawling, climbing, and balancing; able to understand, remember, concentrate and persist for simple and low-level detailed tasks despite some difficulty; ability to adapt to infrequent change and set limited goals and no problems with social interaction.  (DE 16-1, p. 48)  The VE testified that plaintiff could perform the two medium exertion, semiskilled jobs, but that operating heavy equipment was excluded.  (DE 16-1, p. 48)

Counsel asked the VE to consider plaintiff's testimony at the hearing in the context of his answer to the ALJ's hypothetical.  (DE 16-1, p. 48)  The VE responded:

> If the intensity, frequency, and duration of the difficulties described here this morning by Mr. Alsup are at the severe or extreme level, if they're chronic, persistent, unremitting, unmanageable, unresponsive

11

to medication or other forms of treatment . . . I believe the
requirements of full-time work in a conventional job setting on a
sustained basis would present him with serious difficulty.

(DE 16-1, p. 49)  When asked about the effect of a "handheld assistive device," *i.e.*, a cane, the VE

testified that the delivery driver job would not be available, but that a cane "probably" would be a

less of a factor for the tow motor operator.  (DE 16-1, p. 49)

The ALJ then asked what effect difficulty in tolerating moderate to marked difficulty in

tolerating stress would have, to which the VE testified that such a limitation would "be an

unfavorable factor" that such a limitation would be a "potential safety hazard" on plaintiff's ability

to perform his past work.  (DE 16-1, pp. 50-51)  When asked if there were other jobs that plaintiff

could perform under those stress related restrictions, the VE identified three: 1) a general clerk, with

more than 3,000 positions in Tennessee and 120,000 nationally; 2) machine tender, with more than

1,300 positions in Tennessee and 50,000 nationally; and 3) office helper, with over 1,900 positions

in Tennessee and 75,000 nationally.  (DE 16-1, pp. 51-52)

Counsel asked the VE in closing whether moderate difficulty in understanding,

communication, concentration, pace and adaption to change would, in totality, have an effect on

plaintiff's ability to work.  (DE 16-1, p. 52)  The VE replied that, at the "moderate" level, only work

as a heavy equipment operator would be effected.  (DE 16-1, p. 52)

### C.  The ALJ's Notice of Decision

The ALJ entered a "partially favorable" decision on August 10, 2010.  (DE 16-1, pp. 11-28)

The findings of fact and conclusions of law in the decision relevant to plaintiff's request for judicial

review are summarized below.

Plaintiff was under a disability, as defined by the Act, from January
15, 2008 through January 17, 2010.  (DE 16-1, ¶ 11, p. 21)

12

Medical improvement occurred as of January 18, 2010, the date the plaintiff's disability ended. (DE 16-1, ¶ 12, p. 21)

Beginning January 18, 2010, plaintiff had not had an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. (DE 16-1, ¶ 13, pp. 21-22)

The ALJ found that, beginning on January 18, 2010, plaintiff had the RFC to perform the full range of medium work (lift/carry 50 pounds occasionally and 25 pounds frequently; frequently stoop, crouch, kneel, crawl, climb and balance) as defined in 20 CFR 404.1567(c) except that he required a hand-held assistive device such as a cane. Additionally, the plaintiff was able to understand, remember, concentrate and persist in low-level detailed tasks despite some difficulty; adapt to frequent changes; set limited goals; and had no problems with social interaction. (DE 16-1, ¶ 14, pp. 22-24)

The medical improvement that occurred was related to the ability to work. (DE 16-1, ¶ 15, p. 24)

Beginning on January 18, 2010, the plaintiff had been capable of performing past relevant work as a tow motor operator. This work did not require the performance of work-related activities precluded by plaintiff's current RFC. (DE 16-1, ¶ 16, p. 24)

Plaintiff's disability ended January 18, 2010. (DE 16-1, ¶ 17, p. 24)

### III. ANALYSIS

### A. Administrative Proceedings Below

Under the Act, a claimant is entitled to disability benefits if he can show his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905. Corresponding regulations outline the five-step sequential process described below to determine whether an individual is "disabled" within the meaning of the Act.

13

First, the claimant must demonstrate that he has not engaged in substantial gainful activity during the period of disability.

Second, the claimant must show that he suffers from a severe medically determinable physical or mental impairment.

Third, if the claimant shows that his impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1, then he is deemed disabled.

Fourth, the ALJ determines whether, based on the claimant's RFC, the claimant can perform his past relevant work, in which case the claimant is not disabled.

Fifth, the ALJ determines whether, based on the claimant's RFC, as well as his age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled.

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Wilson v. Commissioner of Social Sec.*, 378 F.3d 541, 548 (6th Cir. 2004)(internal citations omitted); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). The claimant bears the burden of proof at steps one through four. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) The burden then shifts to the Commissioner at step five "to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Jones v. Comm'r Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).

The SSA's burden at the fifth step may be met by relying on the medical-vocational guidelines, known the practice as "the grids," but only if the claimant is not significantly limited by nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics in the applicable grid rule. *See Wright v. Massanari*, 321 F.3d 611, 615-16 (6th Cir. 2003). In cases where the grids do not direct a conclusion as to the claimant's capacity, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual

14

vocational qualifications to perform specific jobs, which is typically obtained through the testimony of a VE. *See Wright*, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)). In determining the RFC for purpose of the analysis at steps four and five, the SSA is required to consider the combined effect of all the claimant's impairments. 42 U.S.C. §§ 423(d)(2)(B), (5)(B); *see Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

## B. Standard of Review

The district court's review of the Commissioner's final decision is limited to determining whether the findings of fact are supported by substantial evidence in the record, and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Key v. Callahan* 109 F.3d 270, 273 (6th Cir. 1997). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)(quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's decision must stand if substantial evidence supports the conclusion reached, even if the evidence also could support a different conclusion. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). In other words, if the ALJ's findings are supported by substantial evidence based on the Record as a whole, then those findings are conclusive. 42 U.S.C. §§ 405(g), 1383(c); *Key*, 109 F.3d at 273.

## C. Claims of Error

### 1. Whether the ALJ Properly Relied on the X-Ray Taken January 18, 2010 and the Opinion of Dr. Knox-Carter in Determining That Plaintiff Was Not Disabled After January 17, 2010 (DE 18, p. 6)

Plaintiff argues first that the ALJ erred in relying on "a simple x-ray" of his hip made on

15

January 18, 2010 in determining that he was not disabled after January 17, 2010. (DE 18, p. 6) More particularly, plaintiff argues that the ALJ failed to "address [the] pain from his multiple surgeries that was clearly described in his follow up treatment at Vanderbilt." (DE 18, p. 6)

The ALJ wrote the following with respect to the January 18th x-ray: "The medical records contain a January 18, 2010, x-ray study [that] revealed that the claimant's hip and pelvis had healed with no radiographic evidence of complication and no new abnormalities." (DE 16-1, ¶ 14, p. 23) The record shows that the January 18th x-ray was compared to an x-ray made on July 15, 2009. (DE 16-1, p. 290) A comparison of the two x-rays, the results of which are discussed on pp. 8-9, supports the ALJ's determination that plaintiff's hip and pelvis had healed by January 18th. Plaintiff does not dispute the ALJ's conclusion that his hip had healed by January 18, 2010, only that the ALJ failed to address his pain.

Turning to the "follow up treatment at Vanderbilt" to which plaintiff refers, the record shows that Dr. Kregor's July 15th clinical note following plaintiff's x-ray that same day is the latest objective medical evidence in the record concerning plaintiff's alleged pain, from Vanderbilt or otherwise. In that clinical note, Dr. Kregor wrote that plaintiff had "some" complaints of hip pain.[14] (DE 16-1, p. 291) As previously noted on p. 7, Dr. Kregor did not make a clinical note in connection with the January 18th x-ray. The Magistrate Judge concedes that it is a bit of a stretch to infer the absence of pain for want of a clinical note but, as shown below, the record supports just such an inference.

As previously discussed on pp. 6-7 and n. 10, plaintiff told Mr. Richardson, the physical therapist, a week after his total hip replacement surgery that he was in pain. However, plaintiff

_____

[14] The ALJ made specific reference to the July 15th x-ray in reaching the conclusion that plaintiff's "hip and neck fracture were healing with appropriate alignment" on July 15th, five months after plaintiff's total hip replacement surgery. (DE 16-1, p. 19)

16

characterized his pain as "mild" to "moderate," advising Mr. Richardson that his pain would not interfere with therapy. Thereafter, as noted above, Dr. Kregor noted on July 15th that plaintiff only had "some" hip pain. Finally, as previously discussed on p. 8, plaintiff visited the Hope Clinic as a "new patient" on December 2, 2009, *i.e.*, the month prior to the x-ray at issue being taken, at which time it specifically was noted that plaintiff had no fatigue, no joint pain, no joint stiffness, no swelling, and no tingling/numbness. Taken together, the foregoing objective medical evidence supports the conclusion that plaintiff's "mild" to "moderate" pain in January 2009 improved to only "some" pain in July 2009 and finally to "no" pain in December 2009. In other words, substantial evidence exists in the record to support the conclusion that, not only had plaintiff's hip healed by January 18, 2010, he was no longer in pain as of that date.

Plaintiff argues next that the ALJ erred in relying on Dr. Knox-Carter's April 7, 2009 RFC assessment. More particularly, plaintiff asserts that Dr. Knox-Carter's determination that he was capable of performing medium work effective the date of his total hip replacement, "formed . . . less than two months after claimant's total hip replacement," "fl[ew] in the face of reality," especially given that she noted on February 13, 2009 that he was "using a walker and crutches for ambulation." (DE 18, p. 6)(bold and underline in original omitted)

The ALJ wrote the following in his decision with respect to Dr. Knox-Carter's April 7th opinion as that opinion pertained to the period of disability at issue:

> As for the opinion evidence, Dr. Knox-Carter's April 2009 opinion that the claimant could return to medium work after recovering from his February 2009 hip replacement surgery is given significant weight as it is consistent with the objective medical evidence of record. Dr. Knox-Carter's assessment is adopted in the above residual functional capacity with the additional requirement that claimant uses a cane to ambulate.

(DE 16-1, ¶ 14, p. 23) As previously noted at p. 8 n. 12, Dr. Knox-Carter "projected" plaintiff's

ability to perform the full range of medium work based on the medical <u>assumption</u> that the plaintiff's hip and pelvis would continue to heal, and that his pain would abate. As discussed above in the context of the January 18, 2010 x-ray, Dr. Knox-Carter's projection of plaintiff's ability to perform the full range of medium work is supported by substantial evidence in the record.

For the reasons explained above, the ALJ did not err in relying on the January 18, 2010 x-ray and Dr. Knox-Carter's opinion in determining that plaintiff was not disabled after January 17, 2010. Plaintiff's first claim of error is without merit.

### 2. Whether the ALJ Adequately Addressed Plaintiff's Mental Limitations (DE 18, p. 6)

Plaintiff second claim of error is that the ALJ did not "adequately" address his mental limitations. Citing Mr. Vires's December 11, 2008 consultive report, plaintiff asserts that the ALJ failed to consider fully the following: 1) his moderate to marked difficulty in tolerating stress; 2) that his short term memory seemed compromised; 3) that he received a "borderline score on the digit span tasks of the WAIS-III." The crux of plaintiff's arguments appears to be that the ALJ gave greater weight to Dr Currey's opinion than Mr. Viers's, the former having provided a residual functional capacity "after reviewing the medical evidence of record," and the latter whose opinion was "rendered after an extensive examination of the claimant and t[ook] into account objective testing." (DE 16-1, p. 23) Although not clear from his brief, plaintiff also appears to assert that the ALJ relied improperly on the Medical-Vocational Rules, arguing that "these rules cannot be met by someone under 50 years of age despite their physical and/or mental impairments."

As to the first part of plaintiff's argument, the ALJ noted Mr. Viers's determination that plaintiff had "moderate to marked difficulty in tolerating stress." (DE 16-1, p. 23) Moreover, as previously discussed on p. 12, the ALJ specifically asked the VE what effect "moderate to marked

difficulty in tolerating stress" would have on plaintiff's ability to perform the work that the VE previously had testified plaintiff was qualified to perform. The following testimony was adduced on the issue:

> Q    Would [moderate to marked difficulty in tolerating stress] have any effect on the job that you told us about . . . [t]he . . . tow motor operator.
>
> A    Yes. That would certainly be an unfavorable factor, and we're talking about a job that requires alertness, attention, concentration. It's heavy equipment. It's a potential safety hazard that presents industrial risk factors. And if someone is distracted by stress or any other condition or disorder, that could be disruptive.
>
> Q    All right. What about other jobs that would be available then meeting those criteria?
>
> . . .
>
> A    Some examples of such work would include the job of a general clerk . . . machine tender . . . office helper . . . .

(DE 16-1, pp. 50-51) The VE went on to testify that general clerk, machine tender, and office helper jobs were available in substantial numbers, both in Tennessee and nationwide. (DE 16-1, pp. 51-51) As previously established on pp. 14-15, the ALJ may rely on the VE's testimony in determining that there were substantial numbers of jobs that plaintiff could perform despite his alleged moderate to marked difficulty in tolerating stress.

Plaintiff argues next that the ALJ erred in not "adequately" considering Mr. Viers's opinion that plaintiff's short-term memory was "compromised." Although it is not entirely clear, it appears that plaintiff's argument is that the ALJ erred in relying equally or more heavily on Dr. Currey's report that Mr. Vires's.

A plain reading of Mr. Vires's report reveals that, with the exception of moderate to marked

19

difficulty tolerating stress discussed above, plaintiff's other mental health limitations all ranged from mild to moderate. (DE 16-1, p. 224) Doctor Currey drew the same conclusion, writing: "The MSO from the psych CE panelist, which is given great weight and which is not inconsistent with other evidence in the file, shows no more than mod[erate] impairments in functional abilities due to [mental health] prob[lems] overall," incorporating by reference Mr. Vires's observation that plaintiff's short-term memory appeared "compromised," a limitation to which Dr. Currey referred as plaintiff's "mild remembering" problems. (DE 16-1, p. 246)(capitalization in the original omitted)

A comparison of the two reports shows that, apart from couching plaintiff's limitations in the context of the Act, Dr. Currey's report was entirely consistent with Mr. Vires's. Thus, even if the written decision supports the conclusion that the ALJ gave more weight to Dr. Currey's than Mr. Vires's, it does not matter. Because the reports are consistent with one another, stated reliance on one constitutes concomitant/equivalent reliance on the other.[15]

Next, plaintiff asserts that the ALJ failed to consider adequately that his "borderline score on the digit span tasks of the WAIS-III,"[16] the inference being that the ALJ's disability determination was flawed because he neglected to do so. The record shows that plaintiff's full scale IQ was 76, fifth percentile, verbal IQ was 74, fourth percentile, and performance IQ was 80, ninth percentile. (DE 16-1, p. 223) An IQ of less than 80 may qualify as a severe impairment. *See Salmi v. Secretary of Health and Human Services*, 774 F.2d 685, 696 (6th Cir. 1985).

---

[15] There are three entries in the record pertaining to plaintiff's psychiatric/mental health: the report completed by Mr. Vires (DE 16-1, pp. 220-24); the report completed by Dr. Currey (DE 16-1, pp. 234-51); and a bare-bones report written by Dr. George W. Livingston, Ph.D. that affirmed the report written by Dr. Currey (DE 16-1, p. 256) The only part of the record that related to Dr. Currey's report is Mr. Vires's report.

[16] WAIS III is the third edition of the Wechsler Adult Intelligence Scale (WAIS), a test designed to measure the verbal and performance IQ in adults and older adolescents. www.wikipedia.org/wiki/Wechsler_Adult_Scale.

20

The ALJ noted in his decision that plaintiff's IQ was 76, observing further that his IQ was "between the borderline and low average ranges." (DE 16-1, p. 23) Apart from that, however, it is not apparent that the ALJ considered plaintiff's IQ further in his decision. However, for the reasons explained below, even if the ALJ did not consider plaintiff's IQ, it does not matter.

The record is devoid of any evidence that plaintiff's IQ was adversely affected by his accident, *i.e.*, there is nothing in the record that shows, or even suggests, that plaintiff's IQ was higher before the accident than after. Second, plaintiff had solid, 16-year employment history before the accident as a warehouse driver, heavy equipment operator, shipping clerk, and freight delivery/pickup, etc. – all with a low IQ. (DE 16-1, pp. 151-58) These two factors together constitute substantial evidence that, if plaintiff were able to perform the work that he performed with his low IQ before the accident, then the same IQ would not have prevented him from performing the substantially less demanding work described by the VE at the hearing.

Finally, plaintiff claims that the ALJ erred in applying the Medical-Vocational Guidelines (the Guidelines), 20 CFR Part 404, Subpart P, Appendix 2 in determining that he was not disabled from January 15, 2008 through January 17, 2010. (DE 18, p. 6) Assuming without deciding that the ALJ used the Guidelines improperly, the ALJ nevertheless determined that "a finding of disability is appropriate under SSR 96-8p" during the period January 15, 2008 through January 17, 2010. (DE 16-1, p. 20) Thus, any error in referring to the Guidelines for the period January 15, 2008 through January 17, 2010 was harmless. The record shows that the ALJ did not rely on the Guidelines in determining that plaintiff was not disabled after January 17, 2010.

As shown above, plaintiff was not prejudiced by the ALJ's consideration of plaintiff's alleged mental health issues. Therefore, plaintiff's second claim of error is without merit.

### 3. Whether the ALJ's Decision Addressed Plaintiff's Cervical Spine Abnormalities (DE 18, pp. 6-7)

Plaintiff argues that the ALJ did not discuss his documented cervical spine abnormalities, adding that he had muscle spasms "noted by his treating physician." Plaintiff does not specify the nature of the alleged spinal abnormalities, identify the "treating physician," indicate when or where the alleged treatment was provided, specify what if any follow-on treatment was deemed necessary, or explain how this claim of error is related to his claim for DIB which arose solely from injuries sustained in the January 15, 2008 automobile accident.

The Magistrate Judge has been able to find only limited references in the record that might conceivably apply to this claim. The following was noted in plaintiff's Vanderbilt treatment records: "moderate canal stenosis at 5-6 with severe L 5-6 foramiral stenosis," "degenerative changes in the cervical spine," "mod[erate] canal stenosis C5-6 with severe L 5-6 foraminal stenosis – NSGY [neurosurgery] aware, non-op, no further treatment indicated."[17] (DE 16-1, pp. 212, 214, 217)

The Act's grant of subject matter jurisdiction only permits judicial review of "the final decision of [the Commissioner] made after a hearing." 42 U.S.C. § 405(g). Judicial review of claims arising under the Act is available only after the Commissioner renders a "final decision" on the enrollee's claim. *See Heckler v. Ringer*, 466 U.S. 602, 605 (1984); *Califano v. Sanders*, 430 U.S. 99, 108 (1977)(citations omitted). A claimant receives a final decision from the Commissioner after he exhausts all administrative appeals of an adverse administrative determination. 42 U.S.C. § 1395-w-22(g); 42 C.F.R. § 422.560.

Plaintiff's application for benefits does not make any reference to spinal abnormalities.

---

[17] "Foramiral" means a "a natural opening or passage, especially one into or through a bone"; "stenosis" means "an abnormal narrowing of a duct or canal." *Dorland's* at pp. 729, 1769.

Plaintiff did not raise the issue of alleged spinal abnormalities at the hearing, nor did Plaintiff raise the issue of alleged spinal abnormalities in his request for review by the Review Counsel. In short, the first time plaintiff mentions the alleged spinal abnormalities in any context is in this action.

Because plaintiff did not exhaust this issue in the proceedings below, the district court lacks jurisdiction to consider the claim. Accordingly, plaintiff's third claim of error is without merit.

### 4. Whether the ALJ Properly Addressed Plaintiff's Subjective Complaints of Pain (DE 18, p. 7)

Plaintiff asserts without elaboration that the ALJ "did not properly assess [his] allegations of pain which [we]re clearly supported by the severity of his multiple medical conditions and surgeries." (DE 18, p. 7) Although it is not clear from plaintiff's brief that this is a separate claim, the Magistrate Judge treats it as such.

Social Security regulations prescribe a two-step process for evaluating subjective complaints of pain. The plaintiff must establish an underlying medical condition, and (1) there must be objective medical evidence to confirm the severity of the alleged pain rising from the condition, or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain. 20 C.F.R. § 404.1529(b) (1995); *Jones v. Secretary of Health & Human Servs.*, 945 F.2d 1365, 1369 (6th Cir.1991) (citing *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir.1986)). If a plaintiff establishes such an impairment, the ALJ then evaluates the intensity and persistence of the plaintiff's symptoms. 24 C.F.R. § 404.1529(c) (1995); *Jones*, 945 F.2d at 1369-70. In evaluating the intensity and persistence of subjective symptoms, the ALJ considers objective medical evidence and other information, such as what may precipitate or aggravate the plaintiff's symptoms, what medications, treatments, or other methods plaintiff uses to alleviate his symptoms, and how the symptoms may affect the plaintiff's pattern of daily living. *Id*

The ALJ's credibility determinations are given great weight, and are reviewed for substantial evidence. *Jones*, 336 F.3d at 476.

The record shows that the ALJ followed the required two-step process. (DE 16-1, p. 22) The record also shows that, after considering plaintiff's subjective claims of pain and physical restrictions raised at the hearing, the ALJ determined that plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms," but that those claims were not consistent with the objective medical evidence that he had not pain as of January 17, 2010. (DE 16-1, p. 22)

As previously discussed on pp. 16-17, there is no objective medical evidence in the record that plaintiff was in pain after January 17, 2010. Accordingly, this claim is without merit.

## VI. RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the record (DE 17) be **DENIED**, and the Commissioner's decision **AFFIRMED**.

The parties have fourteen (14) days of being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

**ENTERED** this 5th day of August, 2013.

/s/Joe B. Brown
Joe B. Brown
United States Magistrate Judge

24